## THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| SMHG PHASE I LLC, a Delaware Limited Liability Company,<br><br>Plaintiff,<br><br>vs.<br><br><br>MICHAEL EISENBERG, NOURIEL ROUBINI, and DAVID SHUSTERMAN,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DENYING [10] DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING [19] PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Civil No. 1:22-cv-00035-DBB<br><br>District Judge David Barlow<br>Magistrate Judge Jared Bennett |

This lawsuit is centered on a real estate purchase contract whereby Plaintiff SMHG PHASE I LLC, ("Plaintiff") agreed to sell and Defendants Michael Eisenberg and Nouriel Roubini agreed to buy Lot No. 71 in the Villages at Summit Powder Mountain. The matter is before the court on Defendants Michael Eisenberg, Nouriel Roubini, and David Shusterman's (collectively "Defendants") motion for summary judgment,[1] and Plaintiff's cross-motion for partial summary judgment.[2] The court heard oral argument on the motions on April 21, 2023. For the reasons that follow, the court denies both motions.

---

[1] Defs.' Mot. Summ. J., ECF No. 10, filed June 27, 2022. Although Mr. Shusterman was not a signatory to the contract, he was named in Plaintiff's Complaint and is included collectively with Messrs. Eisenberg and Roubini as "Defendants" solely for the convenience of drafting this decision.

[2] Pl.'s Mot. Partial Summ. J., ECF No. 19, filed August 25, 2022.

# I. BACKGROUND

On April 6, 2017, Defendants Eisenberg and Roubini entered into a Real Estate Purchase Contract ("REPC") with Plaintiff to purchase Lot No. 71, Villages at Summit Powder Mountain, Summit Eden Phase IC Plat.[3] Plaintiff drafted the REPC.[4] The parties agreed on a purchase price of $735,500.[5] The REPC specified that Defendants would pay an Earnest Money Deposit totaling $147,100.00[6] in two parts: $36,775.00 by April 10, 2017; and $110,325.00 by April 26, 2017.[7]

The Earnest Money Deposit was to be held in escrow and released to the Seller "Upon the expiration of the later of the Review Period or the Response Period."[8] Initially, the "Review Period" was to conclude on April 20, 2017—14 days after the April 6, 2017 "Contract Date."[9] However, it was extended until April 26, 2017.[10] The REPC set a closing date of August 31, 2017.[11]

## A. The Relevant Contract Provisions

The REPC provides the following with respect to the "Release of Deposit."

> Upon the expiration of the later Review Period or the Response Period, if applicable, in accordance with Section 6 below, the Deposit shall become nonrefundable and shall immediately be released to Seller for use in development of the Project and the Community, including without limitation, payment of debt service, sales commission, and development costs. Buyer consents to the release of the Deposit and directs the Title Company any additional specific acknowledgements or

---

[3] Eisenberg Decl. ¶ 1, ECF No. 10-11, filed June 27, 2022.
[4] *Id.*
[5] REPC ¶ 1, ECF No. 10-1, filed June 27, 2022.
[6] REPC ¶ 3, ECF No. 10-1 at 3 of 24.
[7] REPC, 4th Addendum § 1, ECF No. 10-1 at 24 of 24 (providing that $36,775.00 shall be due "on or before the 4th calendar day after execution"). The second payment was originally due 14 days after the REPC was executed, but this date was extended to April 26, 2017. REPC, 5th Addendum § 1, ECF No. 10-2 at 2 of 2.
[8] REPC § 3.6, ECF No. 10-1 at 3 of 24.
[9] REPC § 12, ECF No. 10-1 at 7–8 of 24.
[10] REPC, 5th Addendum § 1, ECF No. 10-2 at 2 of 2.
[11] REPC § 12, ECF No. 10-1 at 7 of 23.

instructions that Title Company may require to release the Deposit as provided in this Section 3.6. Buyer shall deliver to Title Company any additional specific acknowledgements or instructions that Title Company may require to release the Deposit as provided in this Section 3.6. The total amount of the Deposit, without interest, shall be credited toward payment of the Purchase Price at Closing.[12]

The REPC contains a "No Financing Contingency," and expressly provides that the "Buyer's obligation to purchase the Lot is not conditioned upon Buyer qualifying for financing or the results of an appraisal of the Lot," and "Buyer acknowledges that he or she shall be responsible for obtaining their own financing for the purchase of the Lot."[13]

The REPC also establishes the parties' respective rights and remedies in the event of either Buyer or Seller default. In the event of Buyer default, Seller's contractual remedies are provided in Section 4.1.

**4.1 Buyer Default.** If Buyer fails to timely perform any of its obligations under this REPC, including the deposit of all necessary documents and funds by the Closing Deadline, Seller may deliver to buyer a written notice demanding that Buyer comply with the terms of this REPC within twenty (20) calendar days from receipt of notice to Buyer. If at the expiration of such period, Buyer has not complied, then Seller, in Seller's sole and absolute discretion, may elect either to: (i) terminate this REPC and retain the Deposit as liquidated damages without being subject to the dispute resolution procedures contained in Section 5, and thereafter the parties shall be released of all further duties and obligations under this REPC; (ii) obtain specific performance of Buyer's duties and obligations under this REPC; or (iii) pursue any other remedy available at law or in equity. Notwithstanding the foregoing, if Buyer defaults after depositing earnest money with the Title Company equal to 15% or more of the Purchase Price (exclusive of interest, if any), and Seller elects to terminate this REPC, then Seller will refund to Buyer such portion of the Deposit in excess of the greater of: (i) 15% of the Purchase Price or (ii) Seller's actual damages. Notwithstanding anything to the contrary in this REPC, and specifically, this Section __, the indemnity obligations of Buyer under this REPC are separate and distinct obligations of Buyer that

---

[12] REPC § 3.6, ECF No. 10-1 at 3 of 24.
[13] REPC § 4, ECF No. 10-1 at 3 of 24.

are not subject to the liquidated damage provisions contained in this REPC. Further, notwithstanding anything to the contrary in this REPC, the liquidated damages provisions contained in this REPC will not act to limit the amount of damages recoverable by Seller against Buyer if Buyer improperly, negligently, recklessly or intentionally records a *lis pendens* or other document or instrument that impairs or could impair Seller's ability to sell the Lot to another Buyer.[14]

Conversely, in the event of Seller's default, Buyer's contractual remedies are provided in Section 4.2 of the REPC:

**4.2 Seller Default.** If Buyer has complied with all of Buyer's obligations and Seller materially breaches this REPC, then Buyer may deliver to Seller a written notice demanding that Seller comply with the terms of this REPC within twenty (20) calendar days from the receipt of notice to Seller. If at the expiration of such period Seller has not complied, then Buyer may, as its sole and exclusive remedy, terminate this REPC and recover the Deposit and any other payments made by Buyer to Seller, and the parties shall be released of all further duties and obligations under this REPC. Buyer acknowledges that Buyer shall have no right to specifically enforce this REPC or record a *lis pendens* or other document or instrument that impairs or could impair Seller's ability to sell the Lot to another buyer. IN NO EVENT WILL SELLER BE LIABLE FOR CONSEQUENTIAL DAMAGES OR DAMAGES BASED UPON ANY INCREASED VALUE OF THE LOT. BUYER HEREBY RELEASES AND WAIVES ANY CLAIMS FOR SUCH DAMAGES. A material breach is a failure of performance by Seller which defeats the very object of this REPC.[15]

The REPC provides the following additional statement regarding the Seller's contractual right to Liquidated Damages if Buyer fails to purchase the property due to any default of Buyer:

**6.  LIQUIDATED DAMAGES AND RELEASE OF FUNDS TO THE SELLER**. BUYER UNDERSTANDS THAT THE LOT IS PART OF A LARGER PROJECT AND THAT AT THE EXECUTION OF THIS REPC, SELLER SHALL REMOVE THE LOT FROM THE LIST OF LOTS BEING OFFERED FOR SALE AND WILL INFORM PROSPECTIVE BUYERS THAT THE LOT IS NO LONGER AVAILABLE FOR SALE BECAUSE OF THE EXECUTION OF THIS REPC.

---

[14] REPC, 1st Addendum § 4.1, ECF No. 10-1 at 15 of 24.
[15] *Id.* § 4.2.

IN SUCH EVENT, SELLER WILL THEREBY BE DEPRIVED OF AN OPPORTUNITY TO SELL THE LOT FROM AND AFTER THE CONTRACT DATE. IT IS THEREFORE AGREED BY THE PARTIES THAT IT IS IMPRACTICAL AND EXTREMELY DIFFICULT TO FIX THE DAMAGES WHICH MAY RESULT FROM ANY FAILURE ON THE PART OF BUYER TO PERFORM ITS OBLIGATION UNDER THIS REPC. ACCORDINGLY, SHOULD BUYER FAIL TO COMPLETE THE PURCHASE OF THE LOT BY REASON OF ANY DEFAULT OF BUYER HEREUNDER, SELLER SHALL BE RELEASED FROM ITS OBLIGATION TO SELL THE LOT TO BUYER AND BY SUBSCRIBING THEIR INITIALS BELOW BUYER AND SELLER AGREE THAT SELLER MAY RETAIN A SUM EQUAL TO THE AMOUNT OF THE DEPOSIT (SUBJECT ONLY TO THE LIMITATIONS OF SECTION 4.1) AS SELLER'S LIQUIDATED DAMAGES AND NOT AS A PENALTY, WHICH AMOUNT SUBSTANTIALLY COMPENSATES SELLER FOR ANY DAMAGES SUSTAINED BY SELLER.[16]

The REPC establishes the following requirements for notices:

10.1 <u>Notices</u>. All notices or deliveries required by this REPC must be delivered to the address set forth on the signature page to this REPC and: (i) be in writing; (ii) signed by the party giving notice; and (iii) received by the other party or the other party's agent no later than the applicable date referenced in this REPC. Notices may be hand-delivered, sent by a nationally recognized overnight delivery service requiring a written acknowledgement of receipt or providing a certification of delivery or attempted delivery, sent by certified mail, return receipt requested, or set by electronic mail (e-mail). All notices so given shall be considered effective: (i) if hand-delivered, when received; (ii) if delivered by e-mail, upon transmission; (iii) if sent by overnight delivery service, one (1) business day after timely deposit with the service, charges prepaid; or if sent by certified mail, three (3) calendar days after deposit. Either party may change the address to which future notices shall be sent by notice given in accordance with Section 8.[17]

The addresses set forth on the signature page for Mr. Eisenberg and Mr. Roubini in the

REPC are listed as follows:

---

[16] REPC, 1st Addendum § 6, ECF No. 10-1 at 16 of 24.
[17] REPC, 1st Addendum § 10.1, ECF No. 10-1 at 17 of 24.

Address:
347 Fifth Ave, Suite 800
New York City, NY 10016

6 East 1st Street, Apt 5A
New York City, NY 10003

E-mail:
Mikeny123@gmail.com
Nroubini@stern.nyu.edu[18]

Finally, the REPC expressly states: "Time is of the essence regarding the dates" in the agreement, and "[e]xtensions must be agreed to in writing by all parties."[19] Although the REPC established an initial closing date of August 31, 2017,[20] the Sixth Addendum to the REPC extended the closing date to July 31, 2018.[21]

### B.  Factual Background

As required under the REPC, Defendants paid the Earnest Money Deposit in the amount of $147,100.00 by April 27, 2017.[22] However, the parties did not close on the property by the August 31, 2017 closing date. Instead, as indicated above, the parties executed a Sixth Addendum to the REPC, signed on May 10 and May 14, 2018, which: (1) extended the closing date to July 31, 2018; and (2) increased the Earnest Money Deposit by $200,000 (for a total of $347,100.00), to be released immediately.[23]

On May 10, 2018, Defendants wired an additional $200,000.00 to the title company. The title company released the funds to Plaintiff on May 14, 2018.[24]

---

[18] REPC at 7, ECF No. 10-1 at 8 of 24.
[19] REPC, 1st Addendum § 10.6, ECF No. 10-1 at 18 of 24.
[20] REPC at 6, ECF No. 10-1 at 7 of 24.
[21] REPC, 6th Addendum ¶ 1, ECF No. 10-3 at 2 of 2.
[22] Eisenberg Decl. ¶ 11, ECF No. 10-11 at 4; Disbursement Register, ECF No. 10-10.
[23] REPC, 6th Addendum ¶ 2, ECF No. 10-3.
[24] Disbursement Register, ECF No. 10-10.

Defendants did not close on the property on or before the July 31, 2018 closing deadline they agreed to in the Sixth Addendum to the REPC.

Approximately 18 months after the July 31, 2018 closing deadline had passed, on February 28, 2020, Brian Williams, on behalf of Plaintiff, sent an email to Defendant Eisenberg at mike@furnishedhabitat.com. The email stated, in part:

> We have had multiple conversations around getting you to close on the lot and have been gracious in extending the closing to accommodate you. . . . Please see the attached Final Notice to Perform and let us know if you would like to proceed with the closing by March 10, 2020. If so, we will tidy up the contract dates and instruct the Title company to send out your closing docs. If you are unable to perform, please let us know as soon as you can.[25]

Consistent with the February 28, 2020 email's content, a "Final Notice to Perform" was attached. It states, in pertinent part:

> SELLER hereby gives Buyer notice to close on the purchase of the Property on or before March 10, 2020 in accordance with the terms of the Agreement.
>
> BUYER: If you do not close on the purchase of the Property within ten (10) days after delivery of this Final Notice to Perform to you, Seller hereby provides you with notice that Seller will cancel the Agreement and you will have no further rights in the property.[26]

Defendants did not close on the property by March 10, 2020. Instead, from March 2020 through June 2020, Plaintiff's agent, Mr. Williams, Defendant Eisenberg, and a business partner of Defendant Eisenberg, David Shusterman, exchanged messages via WhatsApp, wherein Defendants requested additional time to close on the property.[27] The on-going messages

---

[25] ECF No. 19-2 at 92 of 104.

[26] *Id.* at 94 of 104.

[27] Eisenberg Decl. ¶ 20, ECF No. 10-11.

reference closing dates in late April[28] and May,[29] and ultimately Mr. Williams, on behalf of

Plaintiff, agreed to a cash closing date of June 26, 2020.[30]

On June 18, 2020, Mr. Williams sent an email to Defendant Eisenberg at

mike@furnishedhabitat.com and Defendant Shusterman at dshusterman@gmail.com. He did

not email Defendant Roubini. The subject line stated: "Lot 71 / Closing June 26th."[31] The email

references communications between Mr. Williams and Defendant Eisenberg via WhatsApp

during June of 2020 and states:

> I have sent a couple of WhatsApp messages and have not been able
> to reach you.
>
> We need to close on June 26th with cash per the conversation I had
> with Mike the day I found out the loan was not approved. We had
> to reinstate the 10 Day Notice to Perform.
>
> I need to get Brad at GT Title the information for Title so he can
> circulate the closing docs and send over wire instructions for the
> funds. Please let me know how you would like Title to read and
> what the mailing address should be for taxes.[32]

Although Plaintiff's email says, "[w]e had to reinstate the 10[-d]ay Notice to Perform," unlike

the February 28, 2020 email that attached a separate "Notice to Perform," the June 18, 2020

email did not have an attachment.

Defendants did not close on June 26, 2020. However, on June 30, 2020, Defendant

Eisenberg wired an additional $100,000.00 to the escrow agent.[33] A few days later, on July 8,

---

[28] ECF 19-2 at 97 of 104 (WhatsApp message from Eisenberg to Williams stating: "I was under the impression . . .
that you pushed things back to late April").
[29] *Id.* (WhatsApp message from Williams to Eisenberg stating: "Do you feel you guys can close by May 29th? If so I
will have Courtney change the closing date and she can resend the contract").
[30] *Id.* at 98 of 104 (WhatsApp message from Williams to Eisenberg dated June 16, 2020, confirming cash closing
date of June 26, 2020); *see also* Eisenberg Decl. ¶¶ 20–21, ECF No. 10-11; Williams Decl. ¶ 26, ECF No. 18-2;
ECF No. 18 at 3 (confirming that "Plaintiff orally agreed to extend the time to close until June 26, 2020"). The June
26, 2020 closing date was never memorialized in writing in an addendum to the REPC, but neither party has argued
that any issues related to this oral agreement are determinative here.
[31] ECF No. 6-5 (email from Williams to Eisenberg dated June 18, 2020).
[32] *Id.*
[33] Griffiths Decl. ¶ 13, ECF No. 18-3 (stating that "[o]n June 30, 2020, GT Title received a wire transfer of $100,000

2020, Mr. Williams advised Defendant Eisenberg that Plaintiff received the $100,000 in additional funds and asked when the balance of the purchase price would be paid. Defendant Eisenberg responded only that he would be "back in September."[34]

Approximately one year later, and apparently without any further communication between the parties, in June of 2021, Plaintiff sold Lot No. 71 to a different buyer.[35]

In September of 2021, Defendant Eisenberg learned that Lot No. 71 had been sold.[36]

On October 12, 2021, in what appears to be a response to communication by Defendants, Plaintiff's Director of Real Estate, Rory Murphy, sent a letter to Defendants Eisenberg and Shusterman regarding the "Lot #71 Dispute."[37] In the letter, Plaintiff references the "final closing date" of June 26, 2020, the additional payment of $100,000 to GT Title, and Defendants' subsequent lack of communication for over a year.[38] Plaintiff then stated: "As you are aware, given your background in the real estate industry, a partial payment does not close a property or otherwise cure a default to close."[39] Plaintiff explained that over the years, since the initial closing date of August 31, 2017,

> there have been numerous and costly expenses associated with the property that Seller has had to bear and maintain over four year's time. These include property taxes, Assessment Bond payments, Water and Sewer standby fee payments as well as opportunity costs of not having the lot available for sale during the four-year period while this played out. [Plaintiff] has had real costs that were absorbed during the period of time this has been in flux.[40]

---

from Summit Lots 71" an entity affiliated with Eisenberg). There is no evidence that this partial payment of $100,000 was part of any new agreement. Plaintiff never requested the release of the $100,000, and the $100,000 was never released to Plaintiff. *Id.* ¶ 14. On November 16, 2021, GT Title released $103,000 back to Defendant Eisenberg. *Id.* ¶ 15.
[34] Williams Decl. ¶¶ 35–36, ECF No. 18-2.
[35] *Id.* ¶ 39. The record does not identify any communication between the parties from July 2020 until the fall of 2021.
[36] Eisenberg Decl. ¶ 29, ECF No. 10-11.
[37] Defs.' Reply in Support of Mot. Summ. J., Ex. No. 13 at 42 of 74, ECF No. 32, filed Sept. 9, 2022.
[38] ECF No. 32, Ex. 13.
[39] *Id.*
[40] *Id.* at 2.

Plaintiff referenced the "remedies for Buyer Default" in the REPC and stated its position that Defendants are entitled to a return of the amount Defendants deposited in excess of 15 percent of the $735,500 purchase price.[41] Given the parties' subsequent actions, it can reasonably be inferred that Defendants rejected Mr. Murphy's October 12, 2021 offer.[42]

On November 30, 2021, Defendants Eisenberg and Roubini, through counsel, sent a letter to Plaintiff claiming damages, including their lost value in the property, architecture fees, and deposits, due to Plaintiff's alleged breach of the REPC.[43]

On January 14, 2022, Plaintiff initiated this lawsuit alleging that Defendants breached the REPC. Plaintiff's Complaint, filed in the State of Utah's Second Judicial District Court, set forth causes of action for: (1) declaratory relief; (2) breach of contract; and, in the alternative (3) promissory estoppel.[44]

On January 20, 2022, counsel for Defendants emailed a "Second Notice of Default" to Plaintiff, demanding that Plaintiff comply with the terms of the REPC by tendering the property

---

[41] *Id.* ("Our position is that [Defendants] are entitled to a return of $339,775 of the deposit paid, $108,000 of which was never accepted by [Plaintiff] and remains on deposit with GT Title."). Plaintiff objected to Defendants' introduction of Mr. Murphy's letter, citing Federal Rule of Evidence 408, and claiming it was "an offer of compromise." *Id.* at 3 n.4. However, the court is not aware of any prior mediation or settlement negotiations between the parties prior to or related to this letter. In fact, the contents of the letter expressly confirm that at the time it was written the parties had not engaged in any dispute resolution. The letter states, in response to what appears to be a demand or request for dispute resolution by Defendant Eisenberg, that "Mr. Roubini is a signatory on the contract. The contract is joint and several. Any demand *or dispute resolution* would require the written consent of Mr. Roubini, which we do not have." *Id.* at 2. Additionally, the letter itself is not identified as "confidential settlement material." Rather, it appears that the letter was delivered as an attachment to an email sent by Mr. Murphy to Defendant Eisenberg. According to the email, the letter is "[Plaintiff's] response to the concerns [Defendant Eisenberg] raised regarding the deposits/ownership of Lot #71 at the Villages at Powder Mountain Subdivision." ECF No. 32, Ex. 14. Therefore, the court finds there is insufficient evidence to conclude that Mr. Murphy's letter was made during compromise negotiations about the claim as contemplated by Federal Rule of Evidence 408(a)(2).

[42] *See* ECF No. 37 at 3 n.4. In addition, Plaintiff represents that "before filing this lawsuit, Plaintiff renewed [the] October 12, 2021 offer of compromise in a January 14, 2022 letter to Defendants' counsel, offering to return the excess deposit of $236,775 or to provide Defendants with a different lot." *Id.* Plaintiff explained that by January 14, 2022, the excess $103,000 paid to GT Title had been refunded to Defendants "as Plaintiff never accepted it." *Id.*

[43] Compl. ¶ 49, ECF No. 5-1; Ans. & Countercl. ¶ 49, ECF No. 6, filed March 11, 2022.

[44] Compl. ¶¶ 54–70, ECF No. 5-1.

and completing the sale within 20 days.[45]

In early February 2022, Defendants were served with Plaintiff's Complaint.[46] On March 4, 2022, Defendants removed the action to this court.[47] On March 11, 2022, Defendants filed an Answer and asserted Counterclaims against Plaintiff for: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) conversion; (4) breach of contract (alternative claim); and (5) conversion (alternative claim).[48]

A few months later, Defendants moved for summary judgment "in favor of each of [Defendants'] counterclaims" and "against each of the claims" in Plaintiff's Complaint.[49] Although Defendants' motion purports to be all encompassing, Defendants' briefing focuses on the parties' competing claims for breach of contract; Defendants' counterclaim for breach of contract in the alternative; and Defendants' counterclaim for breach of the implied covenant of good faith and fair dealing.[50]

After filing an opposition to Defendants' motion for summary judgment, Plaintiff filed its own cross-motion for partial summary judgment.[51] Plaintiff's cross-motion explicitly states in the opening paragraph that it is limited to Defendants' counterclaims based on breach of contract and seeks a determination as to liability only.[52] However, throughout the briefing,

---

[45] Eisenberg Decl. ¶ 30, ECF No. 10-11.

[46] Mr. Roubini was served on February 4, 2022. ECF No. 2-3 at 8 of 12. Mr. Shusterman was served on February 8, 2022. ECF No. 2-3 at 2 of 12. Counsel accepted service for Mr. Eisenberg on February 3, 2022. ECF No. 2-2.

[47] Notice of Removal, ECF No. 2, filed March 4, 2022.

[48] Ans. and Countercl. at 19, ECF No. 6, filed March 11, 2022.

[49] ECF No. 10 at 1.

[50] Defendants do not address either of their counterclaims based on conversion, nor do Defendants address Plaintiff's cause of action based on Promissory Estoppel.

[51] ECF No. 18; ECF No. 19.

[52] *See* ECF No. 19 at 1 (stating that Plaintiff moves for partial summary judgment on "(1) the First Counterclaim for breach of contract, (2) the Second Counterclaim for breach of the implied covenant of good faith and fair dealing, and (3) the Fourth Counterclaim for breach of contract claim in the alternative (collectively, "Contract Claims")); *see also id.* at n.1 ("Plaintiff notably does *not* seek summary judgment on either Defendants' Third Counterclaim for conversion, or their Fifth Counterclaim for conversion in the alternative, because there are genuine disputes of material fact about if and how much of Defendants' deposit is refundable.").

Plaintiff repeatedly asks the court to affirmatively conclude, as a matter of law, that Defendants breached the REPC as alleged in the Complaint, and to "grant partial summary judgment in favor of Plaintiff."[53] Accordingly, the court construes Plaintiff's cross-motion for partial summary judgment as also seeking summary judgment, limited to the issue of liability, on Count 1, for declaratory relief, and Count 2, for breach of contract, of Plaintiff's Complaint.[54]

Although the scope of the parties' cross-motions is somewhat ambiguous, the parties' substantive positions are clear: both Plaintiff and Defendants argue that the other failed to comply with the express terms of the REPC and was first to breach the agreement as a matter of law. And, both Plaintiff and Defendants argue that under the first breach rule, their further performance was excused, and the other side (the first-breaching party) is precluded from bringing a breach of contract claim against them for their non-performance.[55]

## II. DISCUSSION

Because this matter is before the court on federal diversity jurisdiction,[56] "substantive issues are controlled by state law and procedural issues are controlled by federal law."[57] Thus, federal standards guide the court in resolving the parties' respective burdens on summary

---

[53] *See* ECF No. 18 at 37 ("[T]he Court must deny [Defendants'] Motion, grant partial summary judgment in favor of Plaintiff as shown in Plaintiff's contemporaneously filed Motion for Partial Summary Judgment, and allow this case to proceed to trial on the question of if and how much of Defendants' Deposit is refundable."); ECF No. 19 at 2 (arguing that this court should not only reject Defendant's claim that Plaintiff breached the REPC, but should affirmatively conclude that Defendants breached the REPC, and therefore "Plaintiff is entitled to judgment in its favor on liability as a matter of law on each of the Contract Claims").

[54] *See* ECF No. 5-1 at 9–11.

[55] *See* ECF No. 19 at 2 (arguing that "Defendants breached the parties' contract long before Plaintiff ever did" and "[u]nder the First Breach Rule this means that Plaintiff is entitled to judgment in its favor on liability as a matter of law on each of the Contract Claims"); *Id.* at 7 (arguing that because Defendants materially breached the contract by failing to close on the property by any of the dates discussed with Plaintiff, and because "this failure occurred *before* Plaintiff ever sold the property to someone else, Defendants' Contract Claims are barred by the first breach rule"); ECF No. 32 at 2 (arguing that "[Plaintiff] first (materially) breached the contract" and that "[Defendants'] further (non)performance was excused by [Plaintiff's] first breach").

[56] *See* ECF No. 2 ("This Court has diversity jurisdiction of the above-entitled action pursuant to 28 U.S.C. §1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy requirement has been satisfied. Removal of this action to this Court is, therefore, proper pursuant to 28 U.S.C. § 1441(a).").

[57] *Burnham v. Humphrey Hosp. Reit Trust, Inc.*, 403 F.3d 709, 712 (10th Cir. 2005) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

judgment,[58] but Utah law governs the analysis of the underlying breach of contract claims.[59]

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[60] The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact.[61] Therefore, the court must deny a motion for summary judgment if it finds that there is a genuine issue of material fact that bears on its legal determination or if it finds, as a matter of law based on undisputed facts, that the moving party is not entitled to a legal ruling in its favor.[62] To determine whether a genuine factual dispute exists, courts apply an objective standard asking whether reasonable jurors, properly instructed, could reach only one conclusion; if jurors could reach different conclusions, summary judgment is inappropriate.[63]

This legal standard does not change when the court is presented with cross-motions for summary judgment. Each movant has the burden of establishing the absence of any genuine issue of material fact as to its own motion.[64] In other words, "[t]he denial of one does not require the grant of another."[65] Applying these standards to the cross-motions before the court, neither Plaintiff nor Defendants are entitled to summary judgment in their favor.

---

[58] *See Forster v. Allied Signal, Inc.*, 293 F.3d 1187, 1194–95 (10th Cir. 2002) ("[A] federal court sitting in diversity will be guided by federal-law standards governing summary judgment procedure.").

[59] *See Prager v. Campbell Cnty. Mem'l Hosp.*, 731 F.3d 1046, 1060 (10th Cir. 2013) ("In diversity cases, the substantive law of the forum state governs the analysis of the underlying claims, including specification of the applicable standards of proof, but federal law controls the ultimate, procedural question whether judgment as a matter of law is appropriate.").

[60] Fed. R. Civ. P. 56(a).

[61] *Celotex Corp. v. Catrell*, 477 U.S. 317, 323 (1986).

[62] *See Farm Bureau Property & Cas. Ins. Co. v. Sparks*, 619 F. Supp. 3d 1104, 1109–10 (D. Utah 2022).

[63] *See Thompson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009); *see also Scott v. Harris*, 550 U.S. 372, 386 (2007) (concluding that summary judgment was appropriate because "no reasonable jury could conclude otherwise").

[64] *See Sparks*, 619 F. Supp. 3d at 1109–10.

[65] *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

### A.  **Defendants' Counterclaim for Breach of Contract and Plaintiff's Claim for Breach of Contract**

In this case, both Plaintiff and Defendants assert that the other side is liable for breach of contract as a matter of law. Under Utah law, the elements of a breach of contract claim are: "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[66] Although both parties have asserted a claim for breach of contract, neither side affirmatively addresses these essential elements with respect to their own claim. Instead, it appears that both Plaintiff and Defendants hope to prevail on their breach of contract claim by pointing to the other side's failings. More specifically, both Plaintiff and Defendants argue that, because the other side materially breached the REPC first, their performance was excused, and the other side cannot maintain a breach of contract claim against them as a matter of law.[67]

The first breach rule provides that "[w]hen one party materially breaches a provision of a contract, the other party's subsequent failure to perform a specific obligation is excused."[68] Utah courts have also explained the rule this way: "'[A] party first guilty of a substantial or material breach of contract cannot complain if the other party thereafter refuses to perform' and 'can neither insist on performance by the other party nor maintain an action against the other

---

[66] *Haynes v. Department of Public Safety*, 460 P.3d 565, 567 (Utah 2020) (citing *America West Bank Members, L.C. v. State*, 342 P.3d 224, 230–31 (Utah 2014)).

[67] Although the parties' arguments occasionally seem to suggest otherwise, as explained in text, above, the first breach rule simply precludes the first breaching party from bringing an action against the other party for a subsequent failure to perform a specific obligation. It does not, however, result in a corresponding affirmative determination that the other side did *not* breach the agreement or that the other side was necessarily in compliance with all the terms of the agreement. *See, e.g., Thatcher v. Lang*, 462 P.3d 397, 407 (Utah Ct. App. 2020) (finding that "Buyer was in breach [of the agreement] but seller failed to properly invoke the [Liquidated Damages] Sentence").

[68] *Larsen v. Stauffer*, 518 P.3d 175, 181 (Utah Ct. App. 2022). *Larsen v. Stauffer* makes clear that the first breach rule applies only where the "promises are [mutually] dependent." *Id.* In this case, there is no question that Plaintiff's promise to transfer the property to Defendants and Defendants' promise to fully pay for and close on the property were mutually dependent.

party for a subsequent failure to perform.'"[69]

However, not every minor failure justifies nonperformance.[70] "Only a *material* breach will excuse further performance by the non-breaching party."[71] And, "[w]hether a breach of contract constitutes a *material* breach is a question of fact."[72] Therefore, whether a breach was material "will ordinarily be resolved by the fact finder,"[73] and courts should resolve the issue on summary judgment only with "great caution."[74]

Under Utah law, a breach is material if it is "so substantial that it could be reasonably deemed to vindicate the other's refusal to perform."[75] "The relevant question is not whether the breach goes to the heart of the *provision* breached, but whether it goes to the heart of the contract itself."[76] To be "material," the breach must be "so substantial and fundamental as to defeat the object of the parties in making the agreement."[77] "[C]ertainly a failure of performance which defeats the very object of the contract or is of such prime importance that the contract would not have been made if default in that particular area had been contemplated is a material failure."[78] "Whether a breach is material is a question of degree."[79]

In this case, the parties do not dispute that Defendants were first to breach the REPC.

---

[69] *Kelly v. Timber Lakes Property Owners Ass'n*, 507 P.3d 357, 375 (Utah Ct. App. 2022) (quoting *Backbone Worldwide Inc. v. LifeVantage Corp.*, 443 P.3d 780, 788 (Utah Ct. App. 2019)); *Desert Mountain Gold LLC v. Amnor Energy Corp.*, 409 P.3d 74, 76 (Utah Ct. App. 2017).

[70] *See Sanders v. Sharp*, 840 P.2d 796, 806 (Utah Ct. App. 1992).

[71] *iDrive Logistics LLC v. IntegraCore LLC*, 424 P.3d 970, 986 (Utah Ct. App. 2018) (quoting *Cross v. Olsen*, 303 P.3d 1030, 1036 (Utah Ct. App. 2013) (emphasis added)); *see Larson*, 518 P.3d at 181 ("The first breach rule requires a material breach from the first-breaching party.").

[72] *Cross v. Olsen*, 303 P.3d 1030, 1036 (Utah Ct. App. 2013); *see Larson*, 518 P.3d at 181 ("[W]hether a breach is material is a question for the fact finder."); *iDrive Logistics*, 424 P.3d at 982 ("Whether a party performed under a contract or breached a contract is a question of fact.").

[73] *Cross*, 303 P.3d at 1036.

[74] *Id.*; *see iDrive Logistics*, 424 P.3d at 983 n.9 ("[T]o conclude on summary judgment that any particular failure to perform constitutes a material breach is . . . problematic because it is a question of fact that is generally resolved by a factfinder.").

[75] *Cross*, 303 P.3d at 1035.

[76] *Id.* (citing 14 Richard A. Lord, *Williston on Contracts* § 43:6, at 578–80 (4th ed. 2000)) (emphasis added).

[77] *iDrive Logistics*, 424 P.3d at 987.

[78] *Cross*, 303 P.3d at 1035.

[79] *Id.* at 1036.

Defendants have conceded, for purposes of the pending motions, "that they were in default for failing to complete the [purchase of the property] by the closing date."[80] The parties fiercely dispute, however, whether Defendants' breach was "material." Both sides assert that this issue is so clear and obvious it can be decided as a matter of law.

Plaintiff argues that Defendants' failure to tender the balance of the purchase price and close on the property "even by the latest possible date they believe they had to close – June 26, 2020" – was, unquestionably, a material breach of the agreement.[81] Plaintiff maintains, and Defendants do not dispute, that the very heart of the agreement was purchase of the property. Accordingly, Plaintiff argues that Defendants' repeated failure to close on the Property defeated the very object of the REPC.[82] Based on this, Plaintiff contends, there can be "no reasonable difference of opinion" that "Defendants' failure to close on the property constitutes a 'material breach' of the REPC."[83] Finally, according to Plaintiff, because Defendants committed the first material breach, the first breach rule served to excuse Plaintiff from having to sell the property to Defendants, "bars any recovery by Defendants,"[84] "and means that Plaintiff is entitled to judgment in its favor on liability as a matter of law on each of the Contract Claims."[85]

---

[80] ECF No. 32 at 27.

[81] ECF No. 37 at 8; ECF No. 18 at 31.

[82] ECF No. 19 at 9.

[83] *Id.* at 8.

[84] ECF No. 18 at 36.

[85] ECF No. 19 at 2. Plaintiff makes the additional argument that, under REPC section 3.6 and the Sixth Addendum, Defendants' total deposit of $346,100 (consisting of the $147,100 earnest money deposit plus the additional $200,000 under the Sixth Addendum) is nonrefundable and was properly released to Plaintiff. ECF No. 18 at 20. Plaintiff asserts that section 3.6, which says the deposit is nonrefundable, conflicts with First Addendum sections 4.1 (Buyer Default), 4.2 (Seller Default), and 6 (Liquidated Damages), which discuss contractual damages for default in terms of "refunding" part or all of Defendants' deposit. *Id.* at 28. Based on this alleged conflict, Plaintiff claims "the REPC is clearly ambiguous as to what amount, if any, of the $347,100 Deposit (defined in the REPC), is refundable to Defendants." *Id.* at 4. However, the money at issue in this case has nothing to do with whether Defendants can claim a refund of their deposit under section 3.6 or the Sixth Addendum. The time for "refundability" under those provisions expired upon "the later of the Review Period or the Response Period." REPC § 3.6, ECF No. 10-1 at 3 of 24. This case is about damages and liquidated damages under sections 4.1, 4.2, and 6 of the First Addendum. Simply

16

However, Defendants assert that the object of the REPC – the purchase of the property – was not defeated by their failure to close on June 26, 2020, or on any of the missed closing dates for that matter, because despite Defendants' default, the parties still had the ability to complete the transaction.[86] Defendants assert that section 4.1 of the REPC required Plaintiff to give Defendants formal written notice and 20 days to cure their default before Plaintiff could sell the property to a different buyer. Relying on section 4.1, Defendants argue that their default could not be a "material breach," as a matter of law, until Plaintiff gave them proper written notice and an opportunity to cure.[87]

---

stated, that Defendants' deposit is nonrefundable under section 3.6 and the Sixth Addendum is an entirely separate issue from what Plaintiff may or may not be able to claim as liquidated damages under the REPC.

[86] ECF No. 32 at 29.

[87] According to Defendants, "[t]he [REPC] defines when [Buyer's] breach should be considered material, and requires a 20-day notice and opportunity to cure before the Seller can forfeit the Buyer's interest." ECF No. 32 at 27. For legal support, Defendants rely on *Adair v. Bracken*, 745 P.2d 849 (Utah Ct. App. 1987); *Grow v. Marwick Dev., Inc.*, 621 P.2d 1249 (Utah 1980); *Hansen v. Christensen*, 545 P.2d 1152 (1976); and *Thatcher v. Lang*, 462 P.2d 397 (Utah 2020). These cases do not, however, compel a finding that, as a matter of law, Plaintiff materially breached the agreement by failing to give notice, nor do they compel a finding that Defendants did not materially breach the agreement by failing to close by June 26, 2020. Rather, the cases on which Defendants rely stand for the proposition that when a party is contractually obligated to provide written notice, that party's failure to do so precludes it from enforcing related contractual rights. Beyond that, the cited cases are tailored to their specific facts and contractual agreements. *See, e.g., Thatcher*, 462 P.2d at 407 (concluding that buyer was in breach but vendor did not properly invoke liquidated damages provision). Here, the REPC does not explicitly define what constitutes a material breach or "event of default." *See, e.g., 504 Redevelopment LLC v. SBA Site Management, LLC*, 341 F. Supp. 3d 905, 918–19 (N.D. Ind. 2018) (noting that "per the terms of the agreement" the parties explicitly agreed that an "event of default" would not occur *until* defendant's failure to comply "continue[d] for a period of thirty (30) days after written notice" of such failure was given by such party).

Defendants' argument fails to recognize that the notice and opportunity to cure provision found in section 4.1 is a remedy for Seller provided *specifically* for the purpose of curing the Buyer's already existing breach. Whether the Seller complied with what it was required to do under section 4.1 to terminate the agreement and keep liquidated damages is a separate question from whether the Buyer materially breached the agreement by failing to close by the agreed upon date. The Utah Court of Appeals addressed a similar issue in *Kelly v. Timber Lakes Property Owners Ass'n*, 507 P.3d 357 (Utah Ct. App. 2022). In *Kelly v. Timber Lakes*, after a nonjudicial foreclosure sale, the homeowner sought to set aside the trustee's deed to a purchaser, alleging that the Owners Association's failure to wait three months before publishing the notice of sale rendered the deed void and excused his failure to pay past due assessments. The homeowner argued that because the Association failed to wait the requisite 3 months before recording the notice of sale, under the first breach rule he was excused from paying the dues the Association claimed were due and owing. The trial court rejected the argument, stating that it "ignores the reason for the Notice of Default … and Sale in the first place – that [the homeowner] had failed to pay his [assessments]." *Id.* at 376. On appeal, the Utah Court of Appeals affirmed. It found that the relevant agreements obligated the homeowner to pay assessments and permitted the Association to foreclose as a remedy for past due assessments. The appellate court noted that, even though the homeowner had a right to cure his default during a 3-month grace period before the trustee's sale, the right to cure was triggered only after the Association had initiated nonjudicial foreclosure proceedings as a remedy for the homeowner's existing breach in failing to pay assessments. The appellate court emphasized that the 3-month period was provided specifically for the purpose of curing an *already existing* breach.

Thus, Defendants argue that the first *material* breach occurred when Plaintiff sold Lot No. 71 to another buyer without giving notice. Defendants argue that, because the object of the REPC was the purchase of the property, Plaintiff's sale of the property to a different buyer "irrevocably defeated the object of the REPC"[88] and constituted the first material breach of the agreement. Therefore, applying the first breach rule, Defendants contend their "failure to tender final payment" is excused[89] and "and they are entitled to compensation for losses caused by the breach."[90]

As explained above, "[o]nly a material breach will excuse further performance by the non-breaching party."[91] To determine if a breach is material, Utah courts follow the Restatement (Second) of Contracts.[92] This Restatement provision instructs courts to analyze the following factors to assess whether a breach is material:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with the standard of good faith and fair

---

*Id.* "Thus, any missteps undertaken during the foreclosure process occurred in the context of [the Association's] pursuit of a remedy in response to [the homeowner's] initial breach." *Id.* In upholding the trial court's conclusion that the Association was not the first party to breach the agreement, the Utah Court of Appeals stated that it was not aware of any legal authority "supporting the proposition that failure to properly execute a remedy, in and of itself, constitutes a breach of contract." *Id.; see also, e.g., Thatcher,* 462 P.3d at 376 ("[A]lthough the [trial] court concluded that Seller is not entitled to retain the principal payments as liquidated damages on the ground that she did not provide Buyer proper written notice and an opportunity to cure his alleged breaches, such a conclusion does not—by itself—address which party is entitled to the principle payments where Buyer was in breach but Seller did not properly invoke LD Sentence.").
[88] ECF No. 32 at 37 ("Selling the Lot to another buyer irrevocably defeated the object of the REPC – and made performance of (sic) by [Plaintiff] impossible.").
[89] *Id.*
[90] *Id.* at 2.
[91] *Larson,* 518 P.3d at 181 ("The first breach rule requires a material breach from the first-breaching party.").
[92] *Cross,* 303 P.3d at 1036.

dealing.[93]

Both Plaintiff and Defendants acknowledge these factors in their briefing, however, neither side seriously engages with them.[94]

### (a) The extent to which the injured party will be deprived of the benefit which he reasonably expected.

Regarding the first factor, the Restatement explains: "[A]n important circumstance in determining whether a failure is material is the extent to which the injured party will be deprived of the benefit which he reasonably expected from the exchange."[95] The parties have not presented any evidence to the court on this factor. The court notes, however, that there is some language in the REPC and the record concerning the benefit Plaintiff reasonably expected from a timely closing. For example, the REPC has a "time is of the essence" clause, indicating that timely performance of the parties' respective obligations was important.[96] Additionally, section 6 of the REPC references damages Plaintiff may incur by removing Lot No. 71 from the list of lots being offered for sale while the contract is in place. Finally, the October 12, 2020 letter from Mr. Murphy to Defendant Eisenberg references the "numerous and costly expenses associated with the property that the Seller has had to bear and maintain over four-year's time" while the property has been "in flux."[97]

---

[93] *Id.* (quoting *Cache County v. Beus*, 978 P.2d 1043, 1050 (Utah Ct. App. 1999) (quoting Restatement (Second) of Contracts: Circumstances Significant in Determining Whether a Failure is Material § 241 (Am. Law Inst. 1981))).
[94] Plaintiff asserts that the court need not consider the factors because they "are only relevant to evaluating 'whether [the breach] goes to the heart of the contract itself,'" and "Defendants have already admitted that the heart of the contract … was the purchase of the Property," so, Defendants' failure to close on the purchase of the Property was "a breach that went 'to the heart of the contract itself.'" ECF No. 37 at 11 (quoting *Cross*, 303 P.3d at 1036)). Defendants summarily address 2 of the 5 factors, (c) and (d), and argue that both factors weigh in favor of Defendants and "under the express terms of the contract and the factors set forth in *Cross*, the breach was not material." ECF No. 32 at 30–31.
[95] Restatement (Second) of Contracts § 241 cmt. b.
[96] REPC, 1st Addendum § 10.6, ECF No. 10-1 at 18 of 24.
[97] ECF No. 32, Ex. 13 at 2.

**(b) The extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived.**

The parties have also failed to present any evidence to the court on the second factor – the extent to which Plaintiff can be adequately compensated for Defendants' failure to close by the agreed-upon date. However, like the first factor, the court notes that the REPC contains some potentially applicable language. For example, section 6 of the REPC contains a liquidated damages provision that purports to "substantially compensate" Plaintiff for damages sustained in the event Buyer fails to purchase the lot. However, section 6 does not address or identify the potential for increased expenses specially caused by or attributed to Defendants' repeated delays and missed deadlines.

**(c) The extent to which the party failing to perform or to offer to perform will suffer forfeiture.**

The third factor is the extent to which the party failing to perform or to offer to perform will suffer forfeiture. This factor considers the hardship the breaching party will sustain if it is determined that the breach was material and discharged the parties from their obligations under the contract. Defendants argue that this factor weighs in their favor because, as a general matter, "Utah law 'disfavor[s] forfeiture.'"[98] In addition, Defendants rely on comment (d) to the Restatement (Second) of Contracts for the proposition that "a failure is less likely to be regarded as material after substantial preparation and performance."[99] Defendants argue that their default occurred "late in the party's [sic] dealings," after "substantial investment" by Defendants, including the payment of $450,100, and "after long periods of forbearance by

---

[98] ECF No. 32 at 30 (citing *Housing Authority of SLC v. Delgado*, 914 P.2d 1163, 1165 (Utah Ct. App. 1996) and *Adair v. Bracken*, 745 P.2d 849, 852 (Utah Ct. App. 1987) ("[T]he Court has disfavored forfeiture where the seller has misled the buyer into thinking that the forfeiture provision will not be strictly enforced.")).
[99] Restatement (Second) of Contracts § 241 cmt. d.

Plaintiff."[100] Thus, Defendants claim this factor weighs against a finding that their default was material.

Comment (d) to the Second (Restatement) of Contracts does not provide such obvious support. Although comment (d) does say that that "a failure is *less likely* to be regarded as material if it occurs late, after substantial preparation or performance, and more likely to be regarded as material if it occurs early, before such reliance," comment (d) further explains that "a failure is *more likely* to be regarded as material *if the preparation or performance that has taken place can be returned to the party failing to perform or tender*, and less likely to be regarded as material if it cannot."[101] Comment (d) then provides, as an example, the scenario of a builder who has completed performance under a construction contract and, because the building is on the owner's land, can salvage nothing if the parties are discharged from their obligations under the contract.[102] Comment (d) explains that these facts "argue against a finding of material failure and in favor of one of substantial performance."[103] Conversely, comment (d) explains that where a seller tenders goods and can salvage them by resale to others if they are rejected and he is denied recovery of the price," such facts argue for a finding of "material failure."[104]

Applying the rationale of comment (d) to the facts here, Defendants are unlike the builder who can salvage nothing if his breach is found to be material. In this case, the "preparation or performance" of Defendants "that has taken place" is the deposit of funds toward the purchase of Lot No. 71. And, applying the rationale of comment (d), because

---

[100] ECF No. 32 at 31.
[101] Restatement (Second) of Contracts § 241 cmt. d. (emphasis added).
[102] *Id.*
[103] *Id.*
[104] *Id.* (recognizing, however, that "the potential forfeiture may be aggravated if the seller has manufactured good specially for the buyer" or has spent "substantial sums in shipment").

Defendants' "performance" (the deposit of funds toward the purchase of the property), can be returned to Defendants (the party failing to perform or tender), "the failure is more likely to be regarded as material."[105]

The court recognizes, of course, that in this case, under the terms of the REPC, a finding that Defendants' breach was material would also result in the forfeiture of Defendants' contractual right to purchase Lot No. 71. Additionally, the liquidated damages provision of the REPC, if applicable, would cause Defendants to "forfeit" the amount of their deposit equal to 15 percent of the purchase price. However, Defendants would not forfeit all of the funds they deposited toward the purchase of the property.[106]

### (d) The likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances.

The fourth factor is the likelihood that Defendants would cure their default, taking into account all of the circumstances including any reasonable assurances. Defendants assert this factor should weigh in Defendants favor because the REPC had a "codified notice and opportunity to cure procedure" that Plaintiff failed to follow, and because "Plaintiff had a pattern of forbearing when deadlines were missed in the past."[107] Based on this, Defendants would have the court infer that if Defendants had received proper notice and an opportunity to cure, Defendants would have likely cured the default.

Regarding this factor, a reasonable jury could reach different conclusions. On one hand,

---

[105] *Id.* ("[A] failure is more likely to be regarded as material if the preparation or performance that has taken place can be returned to the party failing to perform or tender.").
[106] The court is not aware of any provision in the REPC that would permit Plaintiff, upon Defendants' material breach, to both sell the property to a different buyer and also keep all the funds Defendants deposited toward the purchase of the property.
[107] ECF No. 32 at 30 (citing *Adair v. Bracken*, 745 P.2d 849, 853 (Utah Ct. App. 1987) ("Until given adequate notice of the [sellers] actual election of their forfeiture remedy, the appellants reasonably assumed that their continued default was being tolerated, as it had been many times in the past, and that their contractual rights were intact long after the . . . delivery of a copy of the . . . notice of default.")).

although Defendants failed to close on June 26, 2020, within a few days of missing the deadline they sent Plaintiff an additional $100,000. While there is no evidence of any further communication from Defendants after early July 2020, a reasonable jury might find that Defendants' additional deposit of $100,000 within days of the missed closing date, combined with previous deposits totaling roughly one-half of the purchase price, were sufficient to make Defendants' eventual, though extremely untimely, performance somewhat likely. This is especially so given Plaintiff's pattern of reluctant forbearance when deadlines were missed in the past.

On the other hand, a reasonable jury could also find that the rolling series of delayed and missed deadlines, the intermittent and often non-responsive communications leading up to the June 26, 2020 closing deadline, and the subsequent year of no communication, showed that Defendants were not likely to ever perform. Moreover, although the notice and 10-day opportunity to cure that Plaintiff served on Defendants in February 2020 and again in June 2020 was not in "strict compliance with the REPC," it did serve to alert Defendants to Plaintiff's growing frustration with Defendants' repeated delays, yet nothing changed.

**(e)  The extent to which the behavior of the party failing to perform or to offer to perform comports with the standard of good faith and fair dealing.**

Finally, a reasonable jury could also reach different conclusions regarding the fifth factor – the extent to which the behavior of the party failing to perform or to offer to perform comports with the standard of good faith and fair dealing. For example, based on the evidence before the court, a reasonable jury might find that Defendants' additional $100,000 payment, sent shortly after Defendants missed the June 26, 2020 closing date, could support a finding of good faith – at least one that would apply to that time frame.

However, a reasonable jury might also find that the year that followed, with no communication from Defendants, prevents a finding of good faith. This is especially the case considering: Plaintiff clearly stated that June 26, 2020 was the last date for closing; Plaintiff did not request another partial payment or deposit in the form of $100,000; Plaintiff had to chase down Defendants on communications, repeatedly; and Defendants never even really tried to close on the property, they just sent an additional, unrequested payment to try and buy more time under an agreement that contained a "time is of the essence" clause.

The court's review of the foregoing factors confirms that whether Defendants' breach was "material," is a question of fact that a jury could decide either way. Because the court cannot say that reasonable jurors, properly instructed, could reach only one conclusion, summary judgment on this issue is improper.[108]

Significantly, the parties' contract claims hinge on this disputed issue of material fact. Because the court cannot determine, as a matter of law, whether Defendants' default constituted a material breach, the court cannot proceed to determine the parties' claims. For example, if Defendants' failure to close on June 26, 2020, is found to be a material breach, then under the first breach rule Plaintiff may be excused from its contractual obligation to sell Lot No. 71 to Defendants, and Defendants' claim for breach of contract based on Plaintiff's sale of the property to a different buyer would be precluded. However, if Defendants' breach is determined to be not material, then Plaintiff's sale of the property to another purchaser might not be excused. Under this scenario, Plaintiff's sale of Lot No. 71 to a different buyer might, instead, constitute the first material breach of the REPC. And, if it were determined that Plaintiff committed the first material breach, then Defendants might assert that they are excused from

---

[108] The court does not mean to suggest that whether Defendants' breach was "material" is the only factual issue that remains unsolved. It is simply the first.

the REPC's requirement to "compl[y] with all Buyer's obligations" in order to pursue Buyer's contractual remedies under the REPC.[109]

In sum, because genuine issues of material fact exist regarding Defendants' breach of the REPC – specifically, whether Defendants' breach was material – both Plaintiff and Defendants cannot satisfy their burden to show that there is no genuine issue of material fact and they are entitled to judgment, as a matter of law, on their respective claims. Accordingly, Defendants' motion for summary judgment on their counterclaim for breach of contract is denied, and Plaintiff's motion for partial summary judgment on its claim for breach of contract is denied.

### B. Defendants' Motion for Summary Judgment on their Counterclaim for Breach of Contract in the Alternative

Defendants' counterclaim for breach of contract, in the alternative, alleges that "even if Plaintiff did have the right to terminate the contract without serving a valid notice," Plaintiff breached the REPC by failing to return the amount of Defendants' deposit that exceeded 15 percent of the purchase price.[110] As explained previously, to establish a claim for breach of contract, a party must show: (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages.[111] Once again, however, Defendants have failed to address any of these essential elements in support of their alternative breach of contract claim.

The Rules of Practice for the United States District Court for the District of Utah set forth specific requirements for summary judgment motions. Local Rule 56-1(b)(4) requires

---

[109] *See* REPC, 1st Addendum § 4.2, ECF No. 10-1 at 15 of 24 ("If Buyer has complied with all of Buyer's obligations and Seller materially breaches this REPC, then Buyer may . . . as its sole and exclusive remedy, terminate this REPC and recover the Deposit and any other payments made by Buyer to Seller, and the parties shall be released of all further duties and obligations under this REPC.").

[110] ECF No. 6 ¶ 49 (Defendants' Fourth Cause of Action: Alternative – Breach of Contract).

[111] *See Haynes*, 460 P.3d at 567.

"[a]n explanation for each claim or defense, establishing under the applicable authority, why the moving party is entitled to judgment as a matter of law. The argument section should include a statement of each claim or defense on which the party is seeking summary judgment and supporting authorities."[112] Defendants have failed to satisfy these requirements. Among other things, Defendants have failed to clearly identify the contractual basis for their alternative breach of contract claim, and they have made no attempt to show or argue that they performed, substantially performed, or that their performance was excused. Because Defendants' argument on this claim is perfunctory and lacks any meaningful analysis, the court could reject it on that basis alone.[113]

However, even if the court considers what it understands to be the substance of Defendants' argument, it is not at all clear that Defendants can state a claim for breach of contract under section 4.1 or section 6 of the REPC.[114] Section 4.1 sets forth *Seller's* remedies in the event of *Buyer's* default.[115] Under section 4.1, if Seller satisfies the 20-day notice to cure requirement set forth therein, then Seller may elect to terminate the REPC and retain as liquidated damages an amount equal to 15 percent of the purchase price.[116] The rights and remedies in 4.1 belong exclusively to the Seller.

To the extent Defendants rely on section 6 of the REPC, it is equally problematic. Section 6 provides for liquidated damages and release of funds to the *Seller* "should buyer fail

---

[112] DUCivR 56-1(b)(4).

[113] *See Mays v. Colvin*, 739 F.3d 569, 576 (10th Cir. 2014) (declining to consider an argument that was not adequately developed and stating that the court "will not construct an argument" for the party); *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (providing that the court should "consider and discuss only those … contentions that have been adequately briefed for . . . review).

[114] The court presumes these are the sections on which Defendants' alternative breach of contract claim is based. Defendants' argument cites only to the Letter of Rory Murphy, ECF No. 32 at 38 n.90. Mr. Murphy's letter references section 4.1. *See* ECF No. 32, Ex. 13 at 2.

[115] REPC, 1st Addendum § 4.1, ECF No. 10-1 at 15 of 24.

[116] *Id.*

to complete the purchase of the lot by reason of any default of buyer hereunder."[117] Like section 4.1, the liquidated damages provision in section 6 is *Seller*'s remedy, not Buyer's. [118] Buyer's express contractual remedy is contained in section 4.2. Defendants have not cited any legal authority, and this court is not aware of any, supporting the proposition that a defaulting Buyer can bring a breach of contract action to enforce a contractual remedy that belongs to the Seller.

Because Defendants have failed to adequately address and provide legal support for this claim, the court denies Defendants' motion for summary judgment on their counterclaim for breach of contract in the alternative.[119]

### C. Defendants' Motion for Summary Judgment on their Counterclaim for Breach of the Implied Covenant of Good Faith and Fair Dealing

Next, Defendants move for summary judgment on their counterclaim alleging that Plaintiff breached the implied covenant of good faith and fair dealing. "The implied covenant of good faith and fair dealing . . . inheres in every contract."[120] It "prohibits the parties from intentionally injuring the other party's right to receive the benefits of the contract and prevents either party from impeding the other's performance of his obligations by rendering it difficult or impossible for the other to continue performance."[121] "It forbids arbitrary action by one party that disadvantages the other."[122] "To comply with [the] obligation to perform a contract in good faith, a party's actions must be consistent with the agreed common purpose and the justified

---

[117] REPC, 1st Addendum § 6, ECF No. 10-1 at 17 of 24.
[118] *See Thatcher*, 462 P.3d  at 406 n.7 ("We note that the [Liquidated Damages] Sentence in the Buyer Default Clause . . . was Seller's remedy, not Buyer's. Buyer's express contractual remedy was provided for by the Seller Default Clause . . . .").
[119] As an additional basis for denying Defendants' motion for summary judgment on this claim, Defendants raised the argument, for the first time, in their Reply. ECF No. 32 at 37.
[120] *Backbone Worldwide Inc. v. LifeVantage Corp.*, 443 P.3d 780, 785 (Utah Ct. App. 2019).
[121] *Id.* A claim for breach of the implied covenant of good faith and fair dealing is a derivative of a breach of contract claim and a party's failure to allege facts necessary to plead breach of contract requires a finding that the party also failed to plead a breach of the implied covenant of good faith and fair dealing. *America West Bank Members, L.C. v. State*, 342 P.3d 224, 231 (Utah 2014).
[122] *Resource Management Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1037 (1985).

expectations of the other party. The purpose, intentions, and expectations of the parties should be determined by considering the contract language and the course of dealings between and conduct of the parties."[123] Finally, the implied covenant of good faith and fair dealing "cannot be read to establish new, independent rights or duties to which the parties did not agree" and cannot "create rights and duties inconsistent with express contractual terms."[124]

Defendants' counterclaim that Plaintiff breached the implied covenant of good faith and fair dealing is inconsistent with the REPC's express limitation on consequential damages. Section 4.2 of the REPC, which sets forth Buyer's sole and exclusive remedy in the event of Seller default, states:

> IN NO EVENT WILL SELLER BE LIABLE FOR CONSEQUENTIAL DAMAGES OR DAMAGES BASED UPON ANY INCREASED VLUE OF THE LOT. BUYER HEREBY RELEASES AND WAIVES ANY CLAIMS FOR SUCH DAMAGES.

Defendants seek to avoid that language by relying on the unpublished decision, *Goodwin v. Hole No. 4,* for the proposition that "the covenant of good faith and fair dealing prevents a real estate seller from intentionally breaching a contract and then relying on that contract to limit the damages."[125] In furtherance of this argument, Defendants state, as the factual basis for their claim, a single conclusory allegation: "[Plaintiff] intentionally breached the contract by selling [the lot] to a third party and keeping [Defendants'] money."[126] Defendants then conclude that, because Plaintiff intentionally breached the contract, Plaintiff cannot rely on the contractual provision limiting liability for consequential damages.[127]

---

[123] *St. Benedict's Development Co. v. St. Benedict's Hospital*, 811 P.2d 194, 200 (Utah 1991).
[124] *Airstar Corp. v. Keystone Aviation LLC*, 514 P.3d 568, 580 (Utah Ct. App. 2022).
[125] ECF No. 10 at 18; ECF No. 32 at 38. Defendants' legal authority is inapposite. *Goodwin v. Hole No. 4, LLC,* No. 2:06-cv-679, 2006 WL 3327990 (D. Utah Nov. 15, 2006), is nothing like this case, and in any event, could only serve as potentially persuasive authority.
[126] ECF No. 32 at 39.
[127] *Id.*

Defendants' conclusory and cursory argument is insufficient to satisfy Defendants' burden on summary judgment. The court need not address claims that are poorly developed and lack meaningful analysis.[128] "[I]t is not this court's duty, after all, to make arguments for a litigant that he has not made for himself."[129] Accordingly, Defendants' motion for summary judgment on its counterclaim for breach of the covenant of good faith and fair dealing is denied.

### D.   Defendants' Motion for Summary Judgment on their Counterclaims for Conversion and Conversion in the Alternative

Defendants also move for summary judgment on Counterclaim No. 3, conversion, and Counterclaim No. 5, conversion in the alternative. These counterclaims, though sparsely pleaded, appear to be based on the same facts as Counterclaim No. 1, alleging breach of contract, and Counterclaim No. 4, alleging breach of contract in the alternative.[130]

Although Defendants represent that they are seeking summary judgment on each of the counterclaims,[131] the word "conversion" does not appear in any of Defendants' briefing. Because Defendants have failed to address the counterclaims based on conversion, the court need not consider them.[132] In addition, Plaintiff expressly declined to move for summary judgment on Defendants' counterclaims for conversion.[133] And, Plaintiff explicitly

---

[128] *Estate of Beauford v. Mesa County*, 35 F.4th 1248, 1270 n.15 (10th Cir. 2022); *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) (providing that the court will not consider "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation"); *see Mays*, 739 F.3d at 576 (declining to consider an argument that was not adequately developed; the court "will not construct an argument" for the party).

[129] *United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015).

[130] ECF No. 6 ¶¶ 39–50; *see id.* ¶¶ 46–47 ("[Plaintiff] has wrongfully kept [Defendants'] money. As a result, [Defendants] have incurred damages in the amount of $347,100 plus interest); *id.* ¶¶ 52–54 ("[Defendants] are the rightful owners of the sum of $236,775 that is currently being held by Plaintiff. Plaintiff has wrongfully kept [Defendants'] earnest money. As a result, [Defendants] have incurred damages in the amount of $236,775, plus interest.").

[131] ECF No. 10 at 1.

[132] *See, e.g., Estate of Beauford,* 35 F.4th at 1270 (declining to address arguments presented in a conclusory manner without factual and legal development); *United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015) ("[I]t is not this court's duty, after all, to make arguments for a litigant that he has not made for himself.").

[133] ECF No. 19 at 1 n.1 ("Plaintiff notably does _not_ seek summary judgment on either Defendants' Third Counterclaim for conversion, or their Fifth Counterclaim for conversion in the alternative.").

acknowledged that by doing so, "[Defendants'] claims for conversion live to die another day."[134] Under these circumstances, the court denies Defendants' motion for summary judgment on Counterclaim Nos. 3 and 5, for conversion and conversion in the alternative.[135]

**E.  Defendants' Motion for Summary Judgment on Plaintiff's Alternative Claim for Promissory Estoppel**

Finally, Defendants do not address or provide any argument in support of their motion for summary judgment on Plaintiff's alternative claim for promissory estoppel. As explained previously, the court will not consider claims that are not properly raised or briefed.[136] Accordingly, Defendants' motion for summary judgment on Plaintiff's alternative claim for promissory estoppel is denied.[137]

//

//

//

//

---

[134] ECF No. 37 at 3.

[135] Additionally, it is not clear that Defendants' counterclaims for conversion, which are based in tort, can proceed in parallel with their breach of contract claims. Under Utah law, where parties enter into a contract that defines their rights and duties, they are precluded from bringing tort causes of action concerning the same subject matter as that governed by the contract. *Biesele v. Mattena*, 449 P.3d 1, 10 n.10 (Utah 2019) ("If there is a contract between the parties to a suit, and the suit arises out of that contract, it is unlikely that tort damages will be available. Doctrines such as the economic loss rule will generally operate to prevent parties from converting contract claims into tort claims in those instances."); *HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 435 P.3d 193, 197 (Utah 2018) (explaining that the economic loss rule will often operate to bar tort claims based on an underlying breach of contract). In this case, Defendants' conversion claims and breach of contract claims appear to be based on the same duties and obligations bargained for in the REPC. Thus, it seems unlikely that a tort remedy will be available.

[136] *See GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1218 (10th Cir. 2022) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to … put flesh on its bones."); *Mays*, 739 F.3d at 576; *Bronson v. Swensen*, 500 F.3d 1099, 1105 (10th Cir. 2007); *Wooten*, 377 F.3d at 1145.

[137] The Utah Supreme Court has stated that "[t]he doctrine of unjust enrichment is designed to provide an equitable remedy where one does not exist at law. Therefore, where an express contract covering the subject matter of the litigation exists, recovery for unjust enrichment is not available." *Thatcher*, 462 P.3d at 406–07 ("In this case, the Contract – which neither party contends is unenforceable – governed the purchase and conveyance of the Property, which is the subject matter of this dispute. Accordingly, both Seller and Buyer are barred from recovering under the quasi-contract theory of unjust enrichment."). In this case, where neither side disputes the enforceability of the REPC, equitable relief seems unlikely.

## III.  CONCLUSION

For the foregoing reasons, Defendants' [10] Motion for Summary Judgment is denied in its entirety. Plaintiff's [19] Cross-Motion for Partial Summary Judgment is also denied. Defendants' [47] Motion for Leave to File a Sur-Reply is denied as MOOT.[138]

DATED August 23, 2023.

BY THE COURT:

David Barlow
United States District Judge

---

[138] On December 21, 2022, Defendants filed a Motion for Leave to File a Sur-Reply. ECF No. 47. The issue identified by Defendants as providing the basis for their request does not bear on and is not relevant to the court's ruling on the cross-motions for summary judgment. Accordingly, Defendants' motion for leave to file sur-reply is denied as MOOT.